### Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2              EAST ST. LOUIS DIVISION
 3
 4    SAM FISHER, #N53175,    )
                              )
 5         Plaintiff,         )
                              )
 6    -vs-                    ) Case No. 15-7-JPG-PMF
                              )
 7    ANTHONY MCALLISTOR, et al,  )
                              )
 8         Defendants.        )
 9
10
       VIDEO CONFERENCING DEPOSITION OF SAM FISHER
11
12
13       The VIDEO CONFERENCING DEPOSITION OF SAM
14    FISHER, produced, sworn and examined on March 22,
15    2016, between the hours of 9:03 a.m. and 10:02 a.m. of
16    that day, at the offices of the Illinois Attorney
17    General, 3000 Montvale Drive, Springfield, Illinois,
18    before Susan Hymes, Certified Shorthand Reporter,
19    License No. 084-003240, for the State of Illinois, was
20    taken on behalf of the Defendant.
21
22
23
24
```

### Page 2

```
 1
                       INDEX
 2
              Ms. Price........Page 4
 3
 4
 5
                     EXHIBITS
 6
 7
              (No exhibits marked)
 8
 9
10
...
24
```

### Page 3

```
 1                  A P P E A R A N C E S
 2    For the PLAINTIFF
 3       BIG MUDDY CORRECTIONAL CENTER
 4       Mr. Sam Fisher - appearing via video
         251 N. Illinois Highway 37
 5       Ina, Illinois  62846
 6
 7    For the DEFENDANT
         ILLINOIS ATTORNEY GENERAL
 8       Ms. Susannah J. Price, Esq.
         500 South Second Street
 9       Springfield, Illinois  62706
         (217) 557-7081
10
11
12
13
14
15
16    COURT REPORTER:
      Susan Hymes, CSR
17    Illinois CSR #084-003240
      Midwest Litigation Services
18    711 N. Eleventh Street
      St. Louis, Missouri  63101
19    Phone: (314) 644-2191
20
...
24
```

### Page 4

```
 1        IT IS HEREBY STIPULATED AND AGREED by and
 2   between the PLAINTIFF and counsel for the DEFENDANT
 3   that this deposition may be taken in shorthand by
 4   Susan Hymes, Certified Shorthand Reporter, and
 5   afterwards transcribed into typewriting; and the
 6   signature of the witness is expressly waived.
 7                *  *  *  *  *  *
 8              SAM FISHER
 9   having been first duly sworn upon his oath testified
10   as follows:
11        EXAMINATION CONDUCTED
12        BY MS. PRICE:
13        Q.  Okay.  Mr. Fisher, will you state and spell
14   your name for the record, please, sir?
15        A.  S-a-m, F-i-s-h-e-r.
16        Q.  Okay.  And like I just told you I'm Susannah
17   Price, and I'm here at my office by video, and you are
18   in the Big Muddy Correctional Center; is that correct?
19        A.  Yes.
20        Q.  Can you hear me okay?
21        A.  Yes, I can hear you.
22        Q.  Okay, perfect.  So I represent the
23   defendants in this case.  That would be Mr. McAllistor
24   and John Does, and Zach Roeckeman is technically still
```

Page 5

1 in I believe for the injunctive relief.
2     Do you understand that, that I represent the
3 defendants?
4     A. Yes.
5     Q. Okay. So this is my opportunity to ask you
6 about the, the claim that you filed against these
7 guys.
8     So let's start with have you ever had your
9 deposition taken before?
10     A. Have I what?
11     Q. Your deposition taken before? Have you ever
12 done something like this in another case or --
13     A. Oh, a long time ago.
14     Q. Okay. About how long ago?
15     A. Wow.
16     Q. It's okay to estimate. I'm not looking for
17 any exact date like anything. And the reason I ask is
18 I want to know if...well, how about this.
19     What was the nature of the deposition? Was
20 it like a civil case like this that you filed?
21     A. A car accident.
22     Q. A car, okay. So it was prior to your
23 incarceration?
24     A. Yeah. I wasn't, I wasn't locked up.

Page 6

1     Q. Okay. And were you the plaintiff in that
2 case like you are right now?
3     A. Yes.
4     Q. Okay. What county was that in?
5     A. Chicago, Cook County.
6     Q. Cook County, okay. And were you successful
7 in that case?
8     A. Yes.
9     Q. Okay. Did it go to trial?
10     A. No. Settled out.
11     Q. Okay. Did you have a lawyer?
12     A. Yes, I did.
13     Q. Do you remember who your lawyer was?
14     A. If I'm not mistaken, I think it was
15 Mazoliak.
16     Q. Okay. All right. So is that the only other
17 time you've ever had your deposition taken?
18     A. I think so.
19     Q. Okay. And what about lawsuits arising out
20 of your incarceration?
21     Have you ever filed any other lawsuit - not
22 necessarily like the same facts, but in the same
23 manner - that it was because of something that
24 happened while you were incarcerated?

Page 7

1     A. Yes.
2     Q. Okay. How many?
3     A. One after this one.
4     Q. Oh, you filed one after you filed this one?
5     A. Yes.
6     Q. Okay. Is that in the, is that in the
7 Southern District?
8     A. Yes.
9     Q. Do you know what case number it is?
10     A. No, I don't know. I don't got the case
11 number at the building.
12     Q. That's okay. Who were the defendants in
13 that case?
14     A. You are talking about who?
15     Q. Who have you sued, yeah.
16     A. Oh, healthcare.
17     Q. Healthcare, okay. So does that have any,
18 does that case have anything to do with this case?
19     A. No.
20     Q. Okay. All right. So this case, and the one
21 that you filed subsequently, are those the only two
22 cases you filed?
23     A. Yes. Yes.
24     Q. Okay, sir. Now, how about your, I'm going

Page 8

1 to ask you some background questions if that's okay.
2     Did you...what's the highest level of
3 education you've received?
4     A. What grade did I stop at?
5     Q. Sure. Yes, sir.
6     A. Oh. I think the 9th.
7     Q. Okay, 9th grade. What, what year was that
8 that you finished 9th grade?
9     A. It was in the 70's.
10     Q. Okay. So did you ever get your GED or
11 anything like that?
12     A. No, ma'am.
13     Q. Okay, sir. Have you done any independent
14 training, like not formal education in a school, but
15 studied yourself any particular subjects?
16     A. No.
17     Q. Okay. So then I mean it's an obvious thing
18 but I will still ask it, do you have any medical
19 training, sir?
20     A. Do I have any what?
21     Q. Medical training? Is that, is that a no?
22     A. What you...I don't understand.
23     Q. Like medical. Have you ever studied
24 medicine in any way? I don't mean did you go to

Page 9

1  medical school. But I mean have you ever, have you
2  ever studied medicine?
3      A. No.
4      Q. Okay.
5      A. No.
6      Q. I didn't mean to trap you at all like that
7  but...okay.
8          When did you, when were you first
9  incarcerated within the Illinois Department of
10 Corrections? What year?
11     A. '85.
12     Q. 1985. Have you been in the custody of the
13 Illinois Department of Corrections since 1985?
14     A. I was locked up in 2006.
15     Q. Okay. So in 1985 how long were you in IDOC?
16     A. Till '88. Three years.
17     Q. And for what, what was your conviction for
18 that, sir?
19     A. Sexual assault.
20     Q. Okay. And what, what facility did you
21 reside at during that time?
22     A. Sheridan.
23     Q. Sheridan. Okay, so in 1988 you were
24 released; is that right?

Page 10

1      A. Yes.
2      Q. And then when did you come back to IDOC?
3      A. 2006.
4      Q. Okay. Have you been in IDOC custody since
5  2006?
6      A. No.
7      Q. Okay. When did you leave IDOC custody
8  arising out of that 2006 conviction?
9      A. I got out 2007.
10     Q. Okay. And what was that conviction, sir?
11     A. Drugs.
12     Q. And what county did you get that conviction
13 in?
14     A. Springfield.
15     Q. Or Sangamon?
16     A. Yeah. I got caught off the expressway.
17     Q. Okay. And what facility did you --
18     A. What?
19     Q. I'm sorry?
20     A. I don't...
21     Q. What, what facility did you reside at then?
22     A. Jacksonville.
23     Q. Okay. So in 2007 when was the next time you
24 came back to IDOC?

Page 11

1      A. 2010.
2      Q. Okay. Have you been in IDOC since 2010?
3      A. Yes.
4      Q. Okay. Have you been at Big Muddy the whole
5  time?
6      A. Yes.
7      Q. And what conviction are you currently
8  serving?
9      A. Drugs.
10     Q. All right, sir. I think that's pretty much
11 it for the background information.
12         And you know I didn't do this, I forgot to
13 ask you if you had any questions. If you basically
14 understand what we are going to do here. That I will
15 answer, or I will ask you questions, and then you will
16 have to give me a verbal answer, a yes or a no,
17 because the court reporter can't take down any head
18 nods and things like that. Do you understand that?
19     A. Yes.
20     Q. Okay. And you do understand that you took
21 the oath and so you are testifying as if you were in a
22 court of law right now, right?
23     A. Yes.
24     Q. Okay, sir. So I'm going to --

Page 12

1      A. I got one question to ask you. What's the
2  purpose of asking me all them questions?
3      Q. Well, sir, the rules of evidence say that
4  I'm allowed to ask you about the convictions because
5  you are a felon and a lot of times in many instances
6  those are allowed to be introduced into evidence if we
7  proceed to trial. Okay?
8      A. Okay.
9      Q. All right. So, anyway, let's just get down
10 to the meat of it.
11         So I think, if I understand it right, you've
12 got an Eighth Amendment unconstitutional strip search
13 claim; --
14     A. Yes.
15     Q. -- is that right? Okay. And then a
16 retaliation in violation of the First Amendment claim,
17 right?
18     A. Yes, I think.
19     Q. Okay. And then an intentional infliction of
20 emotional distress claim also. Does that sound right
21 to you?
22     A. Yes.
23     Q. Okay, sir. So I'm going to start real broad
24 and just ask you, ask you why you filed this lawsuit?

Page 13

1  **How about that?**
2     A. My constitutional rights was violated.
3     **Q. Okay. In what way?**
4     A. The way they treated me.
5     **Q. All right. Well, so I think that you wrote**
6  **in your complaint that there was an incident on May**
7  **15th, 2013; is that right? No, May 13th, 2014?**
8     A. Yes.
9     **Q. Okay. So why don't you tell me what**
10 **happened on that day?**
11    A. Well, the orange crush tactical team came
12 in. There was a whole bunch of noise. They was
13 hitting on the doors with sticks. And then finally
14 they busted the door down. And it was a whole bunch
15 of officers on the, on the gallery. How many I can't
16 say. But when they opened up the door it was two
17 standing there at our door, more officers standing up
18 there, men and females. The officer opened up the
19 door, told us don't look up, don't look up, but at
20 that point in time I was looking up. And he got mad,
21 and he said I told you don't look up, or whatever. So
22 then they, they told me and my cellie to strip. Me
23 and him stripped naked in the room. Then they called
24 my cellie up to the door first and they made him raise

Page 14

1  up his front part.
2     **Q. What do you mean by front --**
3     A. Then --
4     **Q. What do you mean by front part, sir?**
5     A. His penis.
6     **Q. Okay.**
7     A. Made him raise it up. Then they tell him to
8  bend over and spread his cheeks. Then they had us,
9  had him open his mouth with the same hand they told
10 him to bend over with. And then they did me the same
11 way.
12       Then I was talking, I was asking questions
13 asking them why was they doing us, searching us like
14 that in front of the women or whatever. And he was
15 telling me to shut up. I guess I was getting on his
16 nerve for asking questions. And at that point in time
17 after he did all that he kept telling me to shut up.
18 And I asked him one more question, the same thing.
19 And then he told, he started talking to me telling me
20 to shut up again.
21       Then once they did all that they took my
22 cellie out the room. They took, they took both of us
23 out, but they made us put back on our clothes first.
24 Put just the blue pants on, no socks, no underwear, no

Page 15

1  t-shirt and a shirt. And after they did that they
2  made us come out in the hallway and they was, he was
3  mad at me because I was asking the questions. He was
4  shoving me to the wall. And when he shoved me to the
5  wall he had my, his hand on my head to the wall, and
6  he said shut the F up, shut the F up Nigger before I
7  kick your eyes out the back of your head. Then he
8  kept shoving, he was shoving my head to the wall.
9       Then after he did that they handcuffed us.
10 He squeezed the cuffs so tight on my arm. And they
11 lined us up, lined us up with all the guys nut to
12 butts, and then they continued to march us out the
13 building. They took us to dietary. On the way over
14 to dietary, they was walking us over there. They was
15 shoving, shoving guys, shoving all of us with the
16 sticks if we broke the line or couldn't keep up, or
17 whatever, because we was so close together.
18       And they get us over to the dietary. And
19 when they got us over there they was, most of them was
20 standing in the front. A couple of lieutenants was
21 walking around. We was asking them can they loosen
22 the cuffs on our arms because they was so tight. And
23 they kept saying y'all act like women. And then after
24 20 minutes or so they, he decided so many people was

Page 16

1  complaining then he decided to un, you know, loosen
2  some of the cuffs.
3     **Q. Who --**
4     A. He loosened mine too.
5     **Q. Who is "he"?**
6     A. One of the lieutenants.
7     **Q. Okay. All right. You can keep going, sir,**
8  **if there is more.**
9     A. That's, that's it.
10    **Q. That's where your claim ends?**
11    A. Yes.
12    **Q. Okay. So everything you just told me forms**
13 **the basis of your lawsuit? That's, that's the reason**
14 **you filed your lawsuit?**
15    A. Right.
16    **Q. Okay, sir. Well, you said a lot there so**
17 **I'm going to break it down a little bit. Okay? So**
18 **when you were originally...okay, strike that.**
19       **What, what cell were you in, sir?**
20    A. I was in 67.
21    **Q. And was that on R-1-D wing; is that right?**
22    A. Yes. Yes.
23    **Q. Okay. Who was your cellmate?**
24    A. Murphy is all I...Murphy.

Page 17

1    Q. Okay. So you described a strip search that
2  was performed; isn't that right?
3    A. Right.
4    Q. Now, it was a little unclear to me was it
5  performed inside your cell?
6    A. Standing at the front door, yes.
7    Q. Okay. So where was your cellie while you
8  were being searched?
9    A. He was in the room with me.
10   Q. Okay. And you were standing at the --
11   A. Both...they did him first. They had me to
12 stand in the back of him.
13   Q. Okay.
14   A. He was in the room.
15   Q. And you were searched by two officers?
16   A. It was two at the door.
17   Q. Okay.
18   A. More on the hallway.
19   Q. And were they both males?
20   A. Both of the guys was males that I, that I
21 could see of.
22   Q. Okay. Were there, could you see any other
23 officers around?
24   A. In the back of us standing on the gallery.

Page 18

1    Q. Were there any females there?
2    A. Yes.
3    Q. So you could see females while you were
4  being strip searched?
5    A. I looked up, yes.
6    Q. Could they see you?
7    A. I don't know because I only glanced up
8  because they was telling us don't look up. We ain't
9  supposed to look up. So I just happened to look up.
10   Q. Okay. So were the, were the male officers
11 standing in front of your, were they kind of standing
12 in front of your body between you and the women?
13   A. One was standing here, and one was standing
14 here.
15   Q. Okay. You just made a motion with your
16 arms. So one woman --
17   A. One was to the right and one was to the
18 left.
19   Q. Okay. Behind --
20   A. On the door.
21   Q. Oh, so you were in the, standing in the
22 middle of the door and the women --
23   A. Right.
24   Q. -- were to the left and the right?

Page 19

1    A. Right. At the door.
2    Q. Okay. Could you see, could you see any
3  other staff members other than the four you've just
4  described?
5    A. I couldn't see no...when he told me to look
6  down, don't look back up, I didn't see no one else. I
7  just saw that, in that period or moment of time when
8  he, when he brought us to the door, I just happened to
9  look up, and that was it.
10   Q. Okay. So do you know why you were shaken
11 down that day or why you were searched?
12   A. I don't have a clue.
13   Q. Was it a, was it an entire institutional
14 shakedown?
15   A. I guess it was because they was everywhere.
16 I just only know about that one building. That's it.
17   Q. They were, they were searching everyone on
18 your gallery?
19   A. Yeah. They had...yes, the whole gallery.
20   Q. Could you see any of the other inmates being
21 searched? Like did you witness --
22   A. What?
23   Q. Did you witness the other inmates on your
24 gallery being strip searched?

Page 20

1    A. I seen them, I seen them jump on one next
2  door that was in 66. I mean 68 cell.
3    Q. What do you mean "jump on"?
4    A. Four or five officers are on top of him.
5    Q. No, that's not what I meant. I mean could
6  you, like you just described your strip search. Could
7  you see that happening to other inmates?
8    A. It happened to everybody. I mean I can't, I
9  can't say what happened to him. I can only say what
10 happened to me.
11   Q. Okay. So you didn't witness them being
12 strip searched?
13       You didn't watch them be strip searched; is
14 that right?
15   A. They had us looking down. How can we, how
16 could I watch them strip search them? They had us
17 looking down.
18   Q. Sir, I'm not, I'm not saying that you should
19 or should not have. I'm just asking if you did.
20   A. I only, I only know about me. I can't speak
21 on nobody else. But everybody was searched.
22   Q. Okay.
23   A. Everybody was strip searched.
24   Q. Did you see any other inmates naked?

Page 21

1    A. You are not listening to me. You started
2 asking me...I'm only telling you I only seen what they
3 did to me. I can't say what they did to nobody else
4 cause they --
5    **Q. No, but I'm not...listen to me, sir. You**
6 **are not listening to me.**
7        **I'm not asking you what they did to them.**
8 **I'm asking if you could see naked inmates other than**
9 **your cellmate at any point?**
10   A. No, I did not see nobody else because I, I'm
11 looking down on the floor. I can't, I can't say I
12 seen nobody else because I didn't.
13   **Q. Okay.**
14   A. I only know what happened to me.
15   **Q. All right. So the searches weren't**
16 **performed in the middle of the hallway?**
17   A. No, no, not as far as I know of. They came
18 to the door. They opened up the door. Was standing
19 at the door.
20   **Q. Okay. We got a little sidetracked, and**
21 **that's my fault.**
22        **I was asking you about the purpose of the**
23 **search. And I think we have agreed that it was an**
24 **institutional search that day. That the whole**

Page 22

1 **institution was searched.**
2        **And do you know why they normally do an**
3 **institutional shakedown like that?**
4   A. No, ma'am. I'm not an officer.
5   **Q. Okay. In all of your other years being**
6 **incarcerated, have you experienced an institutional**
7 **shakedown before?**
8   A. I can't remember.
9   **Q. Okay. You don't recall?**
10   A. No, I don't recall.
11   **Q. Okay. So there were two officers that**
12 **searched you both males. Why don't you --**
13   A. Yes.
14   **Q. -- walk, will you break down for me exactly**
15 **what they had you do?**
16   A. They had us to, they had us to take off our
17 clothes in the room.
18   **Q. Uh-huh.**
19   A. Once we took our clothes of, they had me
20 standing in the back while my cellie was standing in
21 the front. They had him to pull, when we pulled off
22 our clothes, they had him standing at the door. They
23 told him to lift up his penis. Then they told him to
24 bend over. Then they told him to open your mouth.

Page 23

1   **Q. And is that exactly --**
2   A. After they --
3   **Q. Okay. Go on.**
4   A. After they searched him, they had him to
5 skin, pull the skin back off his penis, and they had
6 me to do the same thing because I'm not circumcised
7 neither.
8   **Q. Okay. They had you, that was the exact same**
9 **thing that they did to your cellmate they also had you**
10 **do; is that right?**
11   A. Yes. They had me, they had me to skin my
12 penis back because I'm not circumcised and lift it up,
13 bend over.
14   **Q. Okay. Did either of the officers touch you?**
15   A. Didn't neither one of them touch me.
16   **Q. Okay. About how long did the search last?**
17 **Just you.**
18   A. I can't recall. I wasn't, I didn't look at
19 no watch or nothing. I don't have no watch.
20   **Q. That's okay. I'm just looking for an**
21 **estimate. Was it like a minute long?**
22   A. It was long enough to, to raise my penis up
23 and bend over and turn back, open my mouth
24 and...however long that was. I don't, that's how long

Page 24

1 it was.
2   **Q. Okay. I mean to me that sounds like that**
3 **could have been accomplished in about 30 seconds.**
4       **Was 30 seconds about the length of it?**
5   A. I can't recall. I don't know.
6   **Q. Well, I'm trying to get you to narrow it**
7 **down here because you filed a Federal lawsuit saying**
8 **that your constitutional rights are violated.**
9   A. Yes, it was.
10   **Q. Well, and I'm here to ask how that occurred.**
11 **So was it longer than five minutes?**
12   A. I don't, I don't have no time. I'm just
13 saying you are trying to get, make me give you a
14 timeframe when I don't know the time.
15   **Q. Okay. Well --**
16   A. I mean I can't tell you no time. I don't
17 know how long it was. It could have been five
18 seconds. It could have been five minutes. It could
19 have been ten minutes. I don't know.
20   **Q. You really, you don't know the difference**
21 **between something that lasts five seconds and**
22 **something that lasts ten minutes? Is that what you**
23 **are telling me here, sir, under oath?**
24   A. I'm saying I don't know how long it was.

Page 25

1  That's what I'm saying.
2      Q. Okay.
3      A. I don't know. I can't tell you the time.
4      Q. Okay. So after the search was finished you
5  said that you, you put some blue pants back on; is
6  that right?
7      A. Right. They had us put our pants on and a
8  shirt, that's it. No underwear, no socks, no t-shirt.
9      Q. Did either of the officers say anything to
10 you during the search?
11     A. I was talking to them asking them why was
12 they humiliating us like that.
13     Q. And --
14     A. Why was they strip searching us like that.
15     Q. And did they say anything?
16     A. Yeah. He told me shut up.
17     Q. Okay. Is that it basically? He just told
18 you those kind of things, be quiet, shut up?
19     A. Yeah. Tell me to quit asking questions.
20     Q. Okay. Did the women say anything?
21     A. No.
22     Q. Okay. Did you hear any other staff say
23 anything in that timeframe?
24     Did you hear any of the other officers that

Page 26

1  were potentially present, did you hear anybody say
2  anything?
3      A. I didn't hear no other officers say nothing
4  except those two.
5      Q. Okay. Now, you talked about one of the
6  officers calling you the, I'm going to use the phrase
7  the N word.
8      A. Yes. Yes.
9      Q. Do you, do you know what I mean when I say
10 that?
11     A. Yes. Yes.
12     Q. Okay. Was the officer that used the N word
13 the same officer that told you to shut up?
14     A. I think so, yes.
15     Q. Okay. Have you identified who these two
16 officers are?
17     A. No. They didn't have no, I couldn't see no
18 name tags.
19     Q. Okay.
20     A. None of that.
21     Q. Are those the two officers that you meant to
22 be defendants in this case?
23     A. The two officers that did, yeah, what they
24 did to us, yes.

Page 27

1      Q. Was there anybody...and then there is
2  obviously Anthony McAllistor that you've sued. But
3  other than those two defendants, or officers that
4  searched you, and Anthony McAllistor, was there
5  anybody else you intended to sue?
6      A. No, ma'am. Just as long as that did what
7  they did.
8      Q. Okay. So it would have been three
9  defendants total?
10     A. And the ones that was shoving us with the
11 sticks. I don't know who them was neither walking us
12 over to dietary, whoever that was.
13     Q. Okay. But did you, did you intend to make
14 them part of this lawsuit?
15     A. Just what I have. I ain't trying to, I'm
16 not trying to --
17     Q. Well, let me tell you this. The reason I'm
18 asking is because there was a, the court's order was a
19 bit vague I think because they weren't really sure
20 what, what you were trying to convey. So your
21 complaint was a little bare. There wasn't a lot in
22 it. So I think the court wondered how many people you
23 were trying to sue.
24     A. I'm going at whoever did what they did.

Page 28

1      Q. Okay. Well, it sounds to me like the only
2  definitive answer you can give me is the two people
3  that searched you, and then Anthony McAllistor; is
4  that right?
5      A. And the other officers that was, that took
6  us over to dietary. I don't...there was, there was
7  some officers that was shoving us with the sticks
8  while they was taking us over there.
9      Q. How many --
10     A. I don't know who they, I don't know who they
11 was. They had us looking down. They tell us don't
12 look up. We couldn't, I couldn't notice, I couldn't
13 notice no officer name, know who they was or none of
14 that.
15     Q. Okay.
16     A. All I could see was legs.
17     Q. So you don't know how many officers were --
18     A. Right.
19     Q. -- prompting you with the sticks? You don't
20 know?
21     A. Yes, ma'am, I don't know.
22     Q. Okay. Well, let's go back to the, to your
23 cell.
24     Oh, about what time of day was this, sir?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com         Phone: 1.800.280.3376         Fax: 314.644.1334

Page 29

1    A. About 1:00.
2      Q. Okay. I think I read that in your
3  complaint. These two officers that searched you. Had
4  you ever seen them before?
5    A. No.
6      Q. So do you believe that they worked at Big
7  Muddy?
8    A. I'm not sure.
9      Q. Okay. Have you seen them since?
10    A. No. I don't even know all the officers
11 here.
12     Q. Right. Would you recognize the two men
13 again if you saw them?
14    A. I only, only glanced up for a second so I
15 can't, I can't really say I could cause I hardly
16 really seen their face.
17     Q. Okay. So we have talked a lot about those
18 two officers, but you have also got this strip search
19 claim against Anthony McAllistor.
20        Who is Anthony McAllistor?
21    A. He was the one directing the officer. He
22 was over the officer that oversee us, or the officers.
23     Q. Okay. How did you know that?
24    A. One of the guys that had the same thing done

Page 30

1  to him, he was told that by someone, that McAllistor
2  was the one that was running the tactical team.
3      Q. Okay. When did he, when did that man tell
4  you that?
5    A. I can't give, I don't know the exact day he
6  told me, but I was told.
7      Q. Okay. By another inmate, right?
8    A. Yes. Yes.
9      Q. Was it the same day of the search?
10    A. I don't think it was the same day.
11     Q. Okay.
12    A. It wasn't the same day.
13     Q. So did you see Anthony McAllistor at Big
14 Muddy?
15    A. I don't even know Anthony McAllistor.
16     Q. Okay. So did he watch, to your knowledge,
17 did he watch the two men strip search you?
18    A. I couldn't tell you that.
19     Q. Okay. So you don't --
20    A. I don't have no, I don't have no knowledge
21 to that.
22     Q. Okay. Do you, do you know whether he was on
23 your wing when the, when the searches were occurring?
24 Do you know?

Page 31

1    A. I don't have no knowledge to that either.
2      Q. Okay.
3    A. I don't know who all was there. I can't,
4  I'm not going to tell you something I don't know.
5      Q. No, I appreciate that, sir. Thank you.
6        So the officer that - and I'm sorry I'm
7  jumping around here - but the officer that used the N
8  word, you mentioned that he kind of shoved you into
9  the wall?
10    A. Yes.
11     Q. All right. Was it...did it, did it hurt?
12    A. I felt it.
13     Q. Did it leave any sort of mark or bruise or
14 anything like that?
15    A. No. I just felt it. He didn't, he didn't
16 do it like this or nothing. Can I show you?
17     Q. Sure.
18    A. He did it like that.
19     Q. Oh, I couldn't see you, sir.
20    A. Oh. Like this.
21     Q. Okay.
22    A. He shoved me to the wall. That's it.
23     Q. So I'm going to try to describe that for the
24 court reporter.

Page 32

1        It looks like you sort of just pushed your
2  head against the wall?
3    A. Yeah. He was close to me and talking to me
4  in my ear.
5      Q. All right. So he didn't slam your head
6  against the wall or anything like that?
7    A. No, he...no, there wasn't none of that. It
8  was just shoving me, shoving me. There is a
9  difference between slam and shove.
10     Q. Sure. Okay. Was it just one sort of push
11 into the wall and then released you?
12    A. He did it a couple of times.
13     Q. All right. And that was right after you
14 questioned him about the strip search?
15    A. Yes. When I was talking to him about the
16 strip search.
17     Q. Okay. Did your cellmate see this?
18    A. I can't recall.
19     Q. Okay. Do you know if anyone else saw it
20 happen?
21    A. I can't, I can't recall on that neither.
22     Q. Okay. Have you ever been strip searched
23 before, sir?
24    A. At the county.

Page 33

1    Q. Okay. In the county when you were
2  first...is that Cook County or Sangamon County?
3    A. Yeah, Cook County.
4    Q. So when you first entered the facility they
5  strip searched you?
6    A. Yes.
7    Q. Is that the only other time you've ever been
8  strip searched?
9    A. I can't recall if they did at Sangamon
10 County. I can't recall it. I don't know.
11   Q. Okay. How was this, how was this search
12 different from that search?
13   A. How was it different?
14   Q. The one that happened on May 13th, 2014 in
15 Big Muddy, how was it different from the search you
16 had done before?
17   A. It was a whole lot different to me, you
18 know. They got in trouble for it too.
19   Q. I don't know what you mean by that? Who?
20 The Cook County?
21   A. Yes, yes. They had to pay a lot of people
22 for that.
23   Q. Okay.
24   A. So...

Page 34

1    Q. So I'm just...like did they there in that
2  strip search did they have you bend over and lift your
3  penis?
4    A. Yes, yes.
5    Q. And spread your butt cheeks?
6    A. Yes.
7    Q. And then open your mouth?
8    A. Yes.
9    Q. Okay.
10   A. But they didn't, they had us open our mouth
11 first when I was at the county.
12   Q. Okay. So with this strip search on...so
13 when you are at Big Muddy since - when is it, 2010 -
14 you don't recall being strip searched at all?
15   A. I can't recall. I don't remember.
16   Q. Well, is it safe to say you would remember
17 being strip searched?
18   A. Would you ask me the question again because
19 I don't understand what you are saying.
20   Q. Have you ever been strip searched before
21 while living at Big Muddy?
22   A. Since I been down here at Big Muddy?
23   Q. Yes.
24   A. That was...I think one, one time they, the

Page 35

1  officer here searched us. I can't recall what day,
2  and I can't remember all the details, but I think they
3  got us out of our rooms one time and took us down to
4  the laundry room. And that's about the only time.
5    Q. Okay. Were you strip searched then or just
6  your room searched?
7    A. I think they made us, if I'm not mistaken, I
8  think they might have made us pull our pants down or
9  something. I don't know. They searched us, but I
10 can't remember all the details to it.
11   Q. Okay. So you couldn't really say then,
12 since you don't remember the first strip search very
13 well, you couldn't really say how this one on May 13th
14 was very different from it?
15   A. No. I just, I just know what they, I just
16 know how it made me feel when they did it, when the
17 orange crush came in and did it.
18   Q. Well, let's talk about that. How did it
19 make you feel?
20   A. It made me feel very uncomfortable, scared.
21   Q. Well, I'm sorry to hear that, sir.
22        Do you believe that the officers intended to
23 make you feel that way?
24   A. I can't recall that neither. I don't know

Page 36

1  how they was feeling.
2    Q. Well, I mean it sounds like they were doing
3  their job. I don't imagine that they were there
4  because they enjoy strip searching grown men.
5        So I mean do you think that they were doing
6  this to, for some reason other than completing their
7  job task?
8    A. I can't tell you that neither.
9    Q. Okay. So with your...you talked about, that
10 you felt sort of emotional distress over this; is that
11 right?
12   A. Yes.
13   Q. Okay. Is that ongoing?
14   A. I still, I still think about the way they
15 did us. I still...I'm pretty sure, I'm pretty sure a
16 lot of people do. You know what I'm saying? Yes
17 I...yes. Because it wasn't, it wasn't, it wasn't even
18 necessary what they did. If they would have just came
19 in and did their job, fine. It was more than me that
20 filed on them. You know what I'm saying? There is a
21 whole bunch of people that has filed on them for, for
22 their behavior that they did.
23   Q. Okay. Well then...you just said if they, if
24 they had just done their job --

Page 37

1    A. Right.
2    Q. -- then you wouldn't be upset. But do you
3  know what they could have done differently? What
4  should they have not done?
5    A. First of all, they shouldn't have never,
6  they shouldn't have never strip searched us in front
7  of female officers. They never, they never should
8  have made us...to me, it's nasty. If you gonna strip
9  search me, why you ain't make me open my mouth first.
10  Why did you make me lift my private parts up first,
11  open my, spread my cheeks and then open my mouth.
12  That's nasty. You know, you wouldn't want nobody
13  doing that to you, would you?
14    Q. I'm sorry, sir, I'm not testifying today.
15    A. Okay.
16    Q. This is the deposition of you.
17    A. Okay.
18    Q. I'm not trying to say that...I'm not
19  commenting on whether anything is right or wrong. I'm
20  just trying to figure out why you filed the lawsuit.
21     And so when you talk about first having to
22  lift your penis and then opening your mouth is it that
23  you had to use your hands to lift your penis and then
24  you had to touch your hands to your mouth; is that

Page 38

1  what you mean?
2    A. Yes. Yes. But you spread your cheeks and
3  then, they had you do like that.
4    Q. Okay.
5    A. Where they can look in.
6    Q. Will your cellmate testify that this is what
7  happened?
8    A. I'm not aware of what my cellmate seen cause
9  they had us hold our heads down, so I can't tell you
10  what my cell, what my cellmate seen.
11    Q. Okay. The officer that shoved you and then
12  called you the N word, how do you know that he was
13  doing that because you objected to the strip search?
14     I mean I know that's kind of a silly
15  question, but I mean how do you know that it wasn't
16  just because you were talking and he wanted you to be
17  quiet?
18     How do you know that it was because of what
19  you said?
20    A. I don't, I can't tell you whether he did
21  because I was talking or what. I can't tell you how
22  he was feeling or what was on his mind. All I know is
23  that he was, I guess, was frustrated because I was
24  asking him questions because I was talking and wasn't

Page 39

1  supposed to talk.
2    Q. Okay, sir. Do you know...so you said
3  earlier that you don't know why they do institutional
4  shakedowns.
5     I mean have you ever heard that they do that
6  kind of thing to locate contraband or weapons or, or,
7  you know, things that inmates aren't supposed to have?
8    A. To my knowledge, I wouldn't know that
9  because officers don't tell the inmates when they
10  going to search us. They don't tell us...that's their
11  job, and we inmates and they officers. So why would
12  they share anything they do with us? I can't recall
13  to none of that because I wouldn't know.
14    Q. Okay, sir. When you were searched on May
15  13th, did they find anything on you or in your cell?
16    A. They didn't find nothing.
17    Q. What about for your cellmate?
18    A. Nothing.
19    Q. Okay.
20    A. They didn't...we had a shakedown slip with
21  none or something on it.
22    Q. I think we have sent that to you; is that
23  right?
24    A. Yeah. Yes. Or whatever. I don't know how

Page 40

1  I got it, but yeah.
2    Q. Well, sir, how do you know, how do you know
3  that these officers, that the actions of them during
4  this search, how do you know that they believed they
5  would cause you any sort of stress, like emotional
6  stress?
7     How were they supposed to know that it was
8  going to cause you stress?
9    A. I can't recall how the officer, I can't, I
10  don't have the...I can't think for the officers and
11  they can't think for me so I wouldn't know.
12    Q. Okay. I understand that.
13     All right. So then I'm going to go back to
14  more of the facts. You are taken into the hallway.
15  The officer, one of the officers that searched you
16  called you the N word and shoved you against the wall.
17  And then, and then you were in a line with other
18  inmates; is that right?
19    A. Yeah. They put us, they handcuffed all of
20  us and had us in a long line and they transferred off
21  the wing to the dietary.
22    Q. Is that how you are normally transported
23  when you are going in a big line like that? Do you
24  ever --

10 (Pages 37 to 40)

Page 41

1    A. I don't --
2    Q. Do you ever...is your whole wing or gallery
3  ever taken anywhere together?
4    A. That was the first time we ever...the only
5  time we go together is when we go to lunch.
6    Q. Okay. And do you go in that same manner?
7    A. Or gym or something. Huh?
8    Q. Do you go in that same manner when you are
9  going to either gym or lunch? Do they line you up
10 like that?
11   A. They have us to pair up, not line us up.
12 They get in two separate lines person to person.
13   Q. Okay.
14   A. We walk, that's how we go to chow, gym, and
15 everywhere.
16   Q. So instead of one long line there is two
17 shorter lines; is that right?
18   A. Yes.
19   Q. Do they --
20   A. That's how they --
21   Q. But do they handcuff you guys like they did
22 with this?
23   A. No. They don't handcuff us taking us to
24 chow or gym or nothing. They don't handcuff us.

Page 42

1    Q. Okay. So this was, this was different than
2  normal when you are, when you are taken to another
3  part of the facility?
4    A. That day was different from the way the
5  officers do it down here.
6    Q. Okay.
7    A. They don't ever take us, they don't handcuff
8  us to take us to no chow or gym or nothing.
9    Q. Okay.
10   A. I mean -- (witness laughing).
11   Q. No, sir, I'm just trying to figure out your
12 claim. I deal with a lot of different prisons. Big
13 Muddy has a lower security level than Pontiac. They
14 do things quite differently in different prisons, so
15 I'm just trying to figure out with what you deal with
16 on a daily basis and why this is different. Do you
17 understand that?
18   A. I understand what you are saying but it
19 seems like you are trying to, seems like you are
20 trying to get me to say something that I, that I don't
21 have no knowledge to. That's what it seems like to
22 me. Like you trying to, like you trying to cross me
23 up or something. Like you trying to...I don't know.
24   Q. I'm just trying to --

Page 43

1    A. But it don't, it don't, it don't seem right
2  with what you asking me because you asking me the same
3  stuff over and over and over like you searching for
4  something.
5    Q. I have explained to you several times that
6  I'm searching for why you filed this lawsuit. And I
7  haven't asked --
8    A. And I --
9    Q. Listen to me. I have not asked you several
10 times one thing over and over again. I'm just trying
11 to figure out exactly what happened on May 13th, 2014,
12 sir.
13   A. I understand what you, I understand your job
14 but it seem like you...okay, come on ask me.
15   Q. Okay. So then you are taken from R-1-D wing
16 to dietary; is that right?
17   A. Yes, they took to us dietary.
18   Q. Okay. About how many other inmates are with
19 you?
20   A. A whole bunch. If I'm not mistaken, it was
21 the whole building. They took all of us. They took,
22 they took the whole wing.
23   Q. So like --
24   A. The whole wing.

Page 44

1    Q. So like --
2    A. The whole 1 D wing.
3    Q. So like 100 inmates or so? I'm just trying
4  to figure out how big the group is.
5    A. I think it's like, it's a hundred and some
6  on one wing.
7    Q. Okay. And do you know how many officers
8  were there?
9    A. I can't tell you how many officers were
10 there. I don't have no knowledge to that.
11   Q. Okay. Were there more inmates than
12 officers?
13   A. I can't tell you that neither.
14   Q. Okay. So you couldn't tell whether there
15 were more inmates than officers?
16   A. There was a whole bunch of officers is all I
17 know.
18   Q. Okay.
19   A. I can't tell you how many.
20   Q. Did you, did you recognize...never mind.
21     So then you talked earlier about these
22 officers had sticks and they were kind of prodding
23 you; is that right?
24   A. Yes. They wasn't only just prodding me.

Page 45

1   They was prodding all of us.
2       Q. Okay.
3       A. They was, everybody that was on that wing
4   was complaining about how they was shoving the sticks
5   walking us over there. They had face guards and
6   sticks. Suited and booted.
7       Q. Okay. Did you physically get touched with a
8   stick?
9       A. Shoved with the, yes, shoved with the stick
10  on the way over there.
11      Q. A lot of times?
12      A. No.
13      Q. Just --
14      A. Not a lot of times.
15      Q. -- one or two times? Is that, is that yes,
16  sir?
17      A. Yes. Yes.
18      Q. Okay. Was it very painful?
19      A. You could feel it.
20      Q. Okay. I mean but did it hurt?
21      A. It wasn't...I felt it.
22      Q. Okay. You understand that's different than
23  what I asked you. See you are acting like I'm trying
24  to --

Page 46

1       A. No.
2       Q. -- do something here, sir. I just asked you
3   a question. I asked you did it hurt. Did it hurt?
4       A. I felt it, yes. I felt it.
5       Q. So is that a yes it hurt or a no it hurt, or
6   it did not hurt?
7       A. It...I felt it so that was a hurt. I felt
8   it.
9       Q. Okay. You understand why I'm asking you
10  this a third time it's because you haven't answered my
11  question. Did it hurt?
12      A. They didn't, they didn't try to knock my
13  side off if that's what you was trying to ask. No,
14  they didn't try to like they was going to break my
15  ribs or nothing like that. No, it wasn't like that.
16      Q. Okay. Was there, because you mentioned that
17  there were a lot of officers with sticks, but then you
18  said you were only hit like one or two times. Was it
19  one officer or two officers? Do you know?
20      A. It was the officers that was walking us over
21  there.
22      Q. Was it the same officers that searched you?
23      A. I can't, I can't, I don't have no knowledge
24  to that neither.

Page 47

1       Q. Okay.
2       A. I can't tell you if it was the same
3   officers.
4       Q. But I'm just trying to figure out like when
5   you were, when you were prodded with the, with the
6   stick, if it was more than one officer that did it to
7   you specifically?
8       A. I couldn't tell you that neither. I had my
9   head down. They was walking us over there.
10      Q. Okay.
11      A. We, we wasn't allowed to look up so I
12  couldn't, I couldn't see who was doing what. All I
13  know I'm looking down. I'm afraid to look up because
14  the way they was treating people and pulling people
15  out of the line, you know, sitting on top of people
16  so...you know what I'm saying? Why would I put myself
17  in there? I already went through enough.
18      Q. I understand that, sir.
19          Do you know why they have inmates keep their
20  heads down during a search like that?
21      A. I guess so we couldn't identify who the
22  officers, we can't see who they is.
23      Q. Okay. That's what your belief is. Has
24  anybody ever told you that?

Page 48

1       A. Ain't nobody ever told me that. I mean
2   that's to my, to my understanding. You know what I'm
3   saying?
4       Q. Okay.
5       A. To my understanding.
6       Q. That's just what you have gathered?
7       A. Yes, that's what I gathered. That the
8   reason why they didn't want us to look up is because
9   they didn't want us to see their face or knew who they
10  was.
11      Q. Okay, sir. I don't think I'm going to have
12  a whole lot more to ask you about, but was that
13  basically the end of, of the incident?
14      A. Yes. They got us to dietary. They kept us
15  over there for about, I'm going to say around 45
16  minutes to an hour.
17      Q. Do you know what they were doing while you
18  were in dietary?
19      A. No. I don't have no knowledge to that. I
20  just know they had us sitting in there for a long
21  period of time, and then when they got finished they,
22  they escorted us back to the building.
23      Q. And then it was...and you were back in your
24  cell with your cellmate?

12 (Pages 45 to 48)

Page 49

1    A.  Yes.  We was back in our cell.  When we got
2    back to the cell, the whole cell was tore up.  They
3    went in our box.  They tore open chips, noddles,
4    poured it all in your box.  It was all over the room.
5    They just went and tore up a whole bunch of our
6    commissary.
7        Q.  Okay.  So is that part of your lawsuit that
8    your, that your room was messed up?
9        A.  I didn't, I didn't, I didn't write my paper.
10   I had somebody else to do it for me because of my
11   situation on, on the reading and writing.  So what all
12   was wrote down wasn't all of them, what all I wanted
13   to put in it wasn't, it wasn't put in because, that
14   wasn't put in because I didn't write it.
15       Q.  Who, who wrote the suit for you, sir?
16       A.  Perry Ward wrote my paper.
17       Q.  Could you repeat that, his name?
18       A.  Perry Ward.
19       Q.  Ward, W-a-r-d?
20       A.  Yes.
21       Q.  Okay.
22       A.  Yes.
23       Q.  Do you, do you know if he is still at Big
24   Muddy?

Page 50

1        A.  Yes, he is still here.
2        Q.  Okay.  So everything, have we talked about
3    everything that forms the reason why you filed this
4    lawsuit?
5        A.  Yes.
6        Q.  Okay.  So are you saying that you had any
7    physical injury because of any of this?
8        A.  Did I have any what?
9        Q.  Physical injury.  Like were you injured at
10   all physically?
11       A.  Just, just a bruise on my arm from the
12   handcuffs.  That's it.
13       Q.  Oh, the handcuffs were on tight, right?
14       A.  Tight, yes.
15       Q.  But other than that there isn't anything
16   physical that happened to you, right?
17       A.  No.  Wasn't nothing broke.  Nothing, none of
18   that, no.  I can't, I won't, I won't tell you no, I
19   won't tell you nothing like that because it won't be
20   true.  They didn't, they didn't beat me down or do
21   anything of that nature to me.
22       Q.  Okay, sir.
23       A.  It was just humiliation, and the words was
24   said, the shoving, and that's it.

Page 51

1    I'm not going to add, I'm not going to add
2    nothing to it, and I'm not going to take nothing away
3    from it of what happened.
4        Q.  I thank you for being honest with me, sir.
5    That's appreciated.
6            So then with your emotional damages we will
7    call it have you been to the doctor, like the
8    psychologist?
9            Have you gone to speak to anybody about what
10   you have suffered?
11       A.  No.
12       Q.  So then, I mean I guess it goes without
13   saying have you, do you have any sort of diagnosis
14   that you've gotten since the incident?
15       A.  What?  Explain?
16       Q.  Like if you go to the doctor, the shrink,
17   the psychologist, they might give somebody a diagnosis
18   where they, where they have said that --
19       A.  No, I didn't, --
20       Q.  Okay.
21       A.  -- I didn't go there.
22       Q.  Okay.  Now, we have talked about a lot of
23   people, and your cellmate was one that was there.
24           Is there anybody, if we go to trial, is

Page 52

1    there anybody that you would call as a witness that we
2    haven't talked about?
3        A.  On what, on what happened to the other
4    people?  That's what you are saying?
5        Q.  Well, I mean, no, who would you…are there
6    any witnesses that you would call to support your
7    claim?
8        A.  No.
9        Q.  Okay.  Well, if there are, you know, we, you
10   and I are under a duty to supplement those to each
11   other.  Rule 26 has us do it.  If you think of
12   somebody that you would call as a witness, please let
13   me know.  Okay?
14       A.  Okay.
15       Q.  Let me just look at my notes really quick,
16   but I think I'm about done with you, sir, if that's
17   all right.
18       A.  Okay.
19       Q.  Okay.  I don't have anything further for
20   you, sir.
21           It's been a really long time since you've
22   had your deposition taken.  You can, you have to sign
23   your deposition transcript, and that's done verbally
24   or in writing.  If you want to do it right now

13 (Pages 49 to 52)

Page 53

1  verbally, then the court reporter will write that
2  down, but if you would rather sign it yourself we will
3  send you a copy of the transcript to review, and then
4  you will, you can make any little changes that you
5  might have and then send back the piece of paper, but
6  you won't be able to keep the transcript.
7       So do you have a preference which way you
8  would like to do that?
9       A. What's the...I don't understand what you are
10 saying.
11      Q. Well, you know the court report here has
12 been taking down everything that --
13      A. Right.
14      Q. Okay. So --
15      A. I understand.
16      Q. So you basically need to testify that what
17 she has taken down is your testimony. And you can
18 either do that right now by saying that you agree to
19 waive signature, or you can reserve signature and then
20 review the transcript in writing, read it, and then
21 sign it with a pen.
22      A. Everything I said is, you know, so, yeah,
23 she can sign it if she wants to.
24      Q. Okay. So then you won't, so you will waive

Page 54

1  signature is what we call it?
2       A. Is it a difference?
3       Q. It's just that you won't have the
4  opportunity to review the transcript itself first.
5  That's the difference.
6       A. I think I will review it first.
7       Q. Okay. So then you will reserve signature.
8  Okay. That's perfectly fine. So we are done and we
9  are off the record.
10          (Brief off the record discussion:)
11         MS. PRICE: Mr. Fisher, after a little more
12 discussion, you've agreed to waive your signature; is
13 that right?
14      A. Right. Yes.
15         MS. PRICE: Okay. Thank you. That's it.
16 We are off the record now.
17         (Deposition concluded at 10:02 a.m.)
18         (Deponent is excused.)

Page 55

1  STATE OF ILLINOIS )
2                   ) SS
3  COUNTY OF MORGAN  )
4       I, SUSAN M. HYMES, Certified Shorthand
5  Reporter for the State of Illinois, do hereby certify
6  that SAM FISHER, the deponent herein, was by me first
   duly sworn to tell the truth, the whole truth and
7  nothing but the truth in the aforementioned cause of
   action.
8       That the foregoing deposition was taken on
   behalf of the Defendant on March 22, 2016.
9       That said deposition was taken down in
   stenograph notes and afterwards reduced to typewriting
10 under my instruction and said transcription is a true
   record of the testimony given; and that it was agreed
11 by and between the witness and attorneys that said
   signature on said deposition would be waived.
12      I do hereby certify that I am a
   disinterested person in this cause of action; that I
13 am not a relative of any party or any attorney of
   record in this cause, or an attorney for any party
14 herein, or otherwise interested in the event of this
   action, and am not in the employ of the attorneys for
15 either party.
        In witness whereof, I have hereunto set my
16 hand this 24th day of March, 2016.
17
18      _____
19              Susan M. Hymes, CSR
                License #084-003240
20
21
22
23
24

14 (Pages 53 to 55)

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| SAM FISHER, #N-53175, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 15-7-JPG |
| | ) | |
| ANTHONY McCALLISTOR, WARDEN | ) | |
| OF BIG MUDDY RIVER | ) | |
| CORRECTIONAL CENTER, and | ) | |
| UNKNOWN OFFICER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR DISCOVERY –
LIMITED – FOR PRODUCTION OF DOCUMENTS**

NOW COME the Defendants ANTHONY McCALLISTER and ZACHARY ROECKEMAN, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and pursuant to Federal Rule of Civil Procedure 34, for their response to Plaintiff's Motion for Discovery for Production of Documents – Limited:

> (A.) Names of the 2 Orange Crush tactical team officers that searched cell-1-D-67 of housing unit 1 on May 13, 2014 at Big Muddy River Correctional Center in INA, IL.

**RESPONSE: Defendants object to the form of this request, because it does not seek the production of documents and is written as an interrogatory. Notwithstanding said objection, Defendants refer Plaintiff to BATES Stamped Doc. No. 000015 a shakedown record from May 13, 2014 for R-1-D-67. Defendants also refer Plaintiff to list of all tactical**

team officers that were present at Big Muddy Correctional Center on May 13, 2014 BATES Stamped Doc. No. 000002 – 000003.

> (B.) The names and gender of the orange crush tactical team officers that searched cell D-66 and D-68 of housing unit 1 on May 13, 2014 at BMRCC in IM, I!

**RESPONSE:** Defendants object to the form of this request, because it does not seek the production of documents and is written as an interrogatory. Defendants refer Plaintiff to BATES Stamped Doc. No. 000016 -- 000018 a shakedown record from May 13, 2014 for R-1-D-66 and R-1-D-68. Defendants also refer Plaintiff to list of all tactical team officers that were present at Big Muddy Correctional Center on May 13, 2014 BATES Stamped Doc. No. 000002 – 000003.

Respectfully submitted,

ANTHONY McCALLISTER and ZACHARY ROECKEMAN,

Defendants,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for the Defendants,

s/Harrison A. Cohen
_____
Harrison A. Cohen, #6317776
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
Phone: (217) 782-9014
Fax: (217) 524-5091
E-Mail: hcohen@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| SAM FISHER, #N-53175, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 15-7-JPG |
| | ) | |
| ANTHONY McCALLISTOR, WARDEN OF BIG MUDDY RIVER CORRECTIONAL CENTER, and UNKNOWN OFFICER, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2015, I caused a copy of *Defendant's Response To Plaintiff's Motion For Discovery – Limited – For Production of Documents* to be mailed by United States Postal Service, in an envelope fully prepaid and properly addressed, to the following:

Sam Fisher, #N-53175
Big Muddy River Correctional Center
251 N. Illinois Highway 37
P. O. Box 900
Ina, IL 62846

                              Respectfully submitted,

                              1

                              s/Harrison A. Cohen

                              Harrison A. Cohen, #6317776
                              Assistant Attorney General
                              500 South Second Street
                              Springfield, IL   62706
                              Phone: (217) 782-9014
                              Fax: (217) 524-5091
                              E-Mail: hcohen@atg.state.il.us